**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

JACQUELINE J. WOLFE,

     **Plaintiff,**

  vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

     **Defendant.**

CASE NO.  8:13CV0187

MEMORANDUM
AND ORDER

    Jacqueline J. Wolfe filed a complaint on June 25, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration.  (ECF No. 1.) Wolfe seeks a review of the Commissioner's decision to deny her application for supplemental security income benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 et seq. The defendant has responded to Wolfe's complaint by filing an answer and a transcript of the administrative record.  (See ECF Nos. 4, 5).  In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated November 13, 2013, (ECF No. 10), each of the parties has submitted briefs in support of her position. (See generally Pl.'s Br., ECF No. 16; Def.'s Br., ECF No. 24). After carefully reviewing these materials, the Court finds that the Commissioner's decision must be affirmed.

## I. PROCEDURAL HISTORY

    Wolfe filed an application for disability benefits under Title XVI on May 14, 2009. (Tr. 220). Her claim was denied initially on August 5, 2009, and on reconsideration on September 23, 2009. (Tr. 120-23, 127-30). Wolfe requested a hearing before an administrative law judge (ALJ) (tr. 133), and a hearing was held on March 24, 2011. (Tr.

106-15). Wolfe asked for additional time to obtain counsel, and the ALJ granted her request. (Tr. 114). The full hearing was then held on September 8, 2011. (Tr. 47-84). In a decision dated October 17, 2011, the ALJ found that Wolfe had not been under a disability at any time from the date the application was filed through the date of the decision. (Tr. 39).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Wolfe had not been engaged in substantial gainful activity since May 13, 2009. (Tr. 24).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c); *id.* § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work

2

setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).

The ALJ found that Wolfe had the following severe impairments: diabetes mellitus; right knee pain; obesity; major depressive disorder, moderate, recurrent; generalized anxiety disorder; borderline intellectual functioning; and alcohol dependence. (Tr. 25).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Wolfe did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 26).

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Wolfe had no past relevant work. (Tr. 33).

---

[1] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience. If the claimant is able to do other work, she is not disabled. The ALJ determined that Wolfe had the RFC to perform unskilled work; lift up to 20 pounds on occasion and up to 10 pounds on a frequent basis; and sit or stand for six hours in an eight-hour workday. She retained the full use of her extremities and was able to do work that did not require bending, stooping, or climbing of stairs. (Tr. 28). Due to Wolfe's severe mental health impairments, she had moderate limitation in the ability to maintain attention and concentration for extended periods; work within a schedule; maintain regular attendance; be punctual within customary tolerances; accept instructions and respond appropriately to criticism from supervisors; complete a normal workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest breaks. (Tr. 28). The ALJ found that, due to the effects of alcohol dependence, Wolfe would fail to attend work for two to three days at a time every two months. (Tr. 29).

The ALJ found that, considering Wolfe's age, education, work experience, and RFC based on all of the impairments, including the substance use disorder, there were no jobs that existed in significant numbers in the national economy that she could perform. (Tr. 33). The ALJ found that if Wolfe stopped the substance use, the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities, and therefore, she would continue to have a severe impairment or combination of impairments. (Tr. 34). If she stopped the substance use, however, Wolfe would not have an impairment or combination of impairments that met or medically

4

equaled any of the impairments listed in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d)). (Tr. 34). And there would be a significant number of jobs in the national economy that she could perform. (Tr. 38). The substance use disorder was a contributing factor material to the determination of disability because she would not be disabled if she stopped the substance use. (Tr. 39). Because the substance use disorder was a contributing factor material to the determination of disability, the ALJ found that Wolfe had not been disabled at any time from the date of the application through the date of the decision. (Tr. 39).

The Appeals Council of the Social Security Administration denied Wolfe's request for review on May 23, 2013. (Tr. 4-9). Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Wolfe seeks judicial review.

## II. FACTUAL BACKGROUND

Wolfe was born May 19, 1961. (Tr. 117). In her application, Wolfe alleged that she had an enlarged heart, mental problems, arthritis, and depression. (Tr. 239). She also stated that she had pain and had difficulty getting around because of her legs. (Tr. 239). She alleged that she became unable to work on March 15, 2001. (Tr. 239).

### A.    Medical Evidence

In January 2009, Wolfe was required to obtain a chemical dependency evaluation as part of a job training program provided by vocational rehabilitation services. (Tr. 375). She reported that she had been hospitalized 13 years earlier for an enlarged heart and that she had hypertension and breathing problems. (Tr. 375). During the evaluation, Wolfe reported that she first used alcohol when she was 15. (Tr. 376).

She had been treated for alcohol abuse 19 times. Wolfe had last attended 180 days of outpatient treatment seven months earlier, but she did not successfully complete the treatment. (Tr. 377). Wolfe stated that her drinking had slowed down for the past four years when she would go on monthly binges and then would sober up for one to two months at a time. (Tr. 377).

Wolfe stated that she had experienced serious depression and anxiety in the past 30 days. In her lifetime, she had also experienced trouble understanding, concentrating, or remembering, and controlling violent behavior. Wolfe said she had serious thoughts of suicide, but she had never attempted suicide. (Tr. 380). Wolfe refused to enter any type of residential treatment, but she said she was willing to meet with a psychologist and attend Alcoholics Anonymous (AA) meetings in order to stay sober. (Tr. 381). She was diagnosed with alcohol dependence with physiological dependence and major depression disorder. Her GAF was 45.[2] (Tr. 382). It was recommended that she abstain from all mood-altering chemicals except those prescribed by a physician, schedule a diagnostic interview with a psychologist, complete high intensity residential treatment, attend and participate in four to five AA meetings per week, and participate in anger management. (Tr. 382).

Wolfe began seeing James M. Burger, Ph.D., once or twice a month for therapy. (Tr. 385-97). In May 2009, Burger completed a form to assist Wolfe in receiving state

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). A GAF between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV-TR.

assistance and stated that Wolfe had a major depressive disorder, single episode, which prevented her from working at the present time. (Tr. 399). He did not have sufficient medical evidence to confirm whether she would be medically unable to work for up to or longer than six months. (Tr. 399).

On July 1, 2009, Allen George, M.D., reported that Wolfe complained of knee pain which made it difficult to stand for more than 20 minutes at a time. Wolfe said when she sat for more than 20 or 30 minutes, she had difficulty getting up because her legs and knees were stiff. She stated that she had to quit her last job because it required a lot of standing. Wolfe said she could not lift more than 10 pounds because lifting exacerbated her incontinence. She stated that she had to go up stairs one at a time and could not kneel or crawl without a lot of pain. Wolfe stated she had started having chest pains a few months earlier. She had palpitations for about 10 minutes at a time, but she had never asked a doctor about the episodes. Wolfe stated that she had suffered from shortness of breath for approximately 10 years and hypertension for five years. She stated that a friend monitored her sleep recently and noted that she had apneic spells. Her shortness of breath limited the distance she could walk to three or four blocks. (Tr. 403). Wolfe reported that she had not drunk alcohol for approximately three months. (Tr. 404).

Dr. George stated that Wolfe had good range of motion in her knees. She showed no obvious signs of mental illness or retardation. (Tr. 408). Dr. George stated that Wolfe could do some type of work where she could sit for an extended period of time, but she had difficulty with her vision. (Tr. 409). He stated that her chest pain

needed to be further evaluated and her blood pressure needed to be better controlled. (Tr. 409).

Jennifer Grubler, Ph.D., conducted a psychological interview on July 1, 2009. (Tr. 411). Wolfe reported that she attended a boarding school on the reservation between the ages of seven and 14. (Tr. 411). She stated that she had four adult children, but her parental rights were terminated when they were young due to Wolfe's use of alcohol. (Tr. 412). She stated she had been homeless from the time of her husband's death 20 years earlier until two years previously when she moved into a basement apartment at her sister's home. Wolfe reported that she dropped out of school in the 11th grade and later obtained her GED. She never received any special education services in school. Wolfe stated that she had not worked consistently since the death of her husband. Her only employment had been occasional work through temporary services. (Tr. 412).

Wolfe reported that her last admission to inpatient treatment had been 15 to 20 years earlier. (Tr. 411-12). She would remain sober upon discharge, but would always relapse. (Tr. 412). Wolfe had been hospitalized twice for alcoholism, most recently in 2002. In 2008, she participated in an outpatient treatment program on the reservation, but she stopped going after a month. She reported that she had not consumed alcohol in two to three months. (Tr. 413). Wolfe reported that she had recently started taking Cymbalta, and she believed it might be helping, but she still was depressed and cried for no reason. (Tr. 413). Wolfe reported that she had poor energy and had difficulty sleeping due to worry. (Tr. 413). She showed no signs of anxiety, tension, psychomotor agitation, or substance abuse during the interview. (Tr. 414).

Wolfe stated that she did not spend time with friends because in the past social activities always involved drinking. She also stated that she tried to spend time with her grandchildren, but she became easily irritated with them without real provocation. Grubler stated that Wolfe's attention and concentration were probably reduced somewhat by her significant distress, but she would be capable of maintaining sufficient attention and concentration to complete short and simple tasks. She was also capable of remembering and carrying out short and simple tasks, though at times it might take her longer to do so. She would likely be capable of relating appropriately to coworkers and supervisors. (Tr. 414). She was diagnosed with major depressive disorder, recurrent, moderate, and alcohol dependence, early full remission. Her GAF was 51.[3] (Tr. 414). Grubler stated that Wolfe's prognosis with appropriate therapeutic intervention was fair. Her long history of alcohol dependence and the early stage of her current sobriety indicated a high risk for future relapse, particularly given her symptoms of depression. Wolfe needed additional mental health services. (Tr. 414). Grubler stated that Wolfe had restrictions in activities of daily living due to a lack of motivation and energy resulting from depression. (Tr. 416). She had recurrent episodes of deterioration when stressed because she increased her alcohol use and her symptoms of depression worsened. (Tr. 416).

In December 28, 2009, Wolfe went to the community mental health center for medication management. (Tr. 475). She reported depression, anxiety, poor sleep and appetite, low energy, low tolerance, and irritability. Wolfe stated that she would like to work but felt she was unable to do so at the time. (Tr. 478).

---

[3] A GAF between 51 and 60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning. DSM-IV-TR.

In June 2010, Wolfe began receiving assistance from Community Alliance. (Tr. 487). Wolfe reported she was applying for Social Security disability benefits. (Tr. 488). It was noted that she had poor impulse control and a history of homelessness. (Tr. 488). Wolfe had recently been banned from attending her church due to an incident of verbal aggression toward a church member. She was living in an apartment funded by general assistance. (Tr. 488). Wolfe stated she was not interested in residential rehabilitation or drug and alcohol counseling, but she would attend AA meetings. (Tr. 489). Wolfe stated that she did not wish to work in the future. Her last job was at a motel for one month in 1989. (Tr. 491).

Community Alliance staff reported that Wolfe had limited social support and only one friend who supported sobriety. She was not currently attending church or AA meetings. (Tr. 493). She reported memory loss, difficulty with balance and coordination, dizziness, auditory hallucinations, and panic attacks, none of which she had discussed with physicians. Staff reported that it was appropriate for her to pursue disability benefits at the time. She had significant short-term memory problems, unstable moods, a potential for verbal and physical aggression, concentration problems, problems with balance and coordination, poor impulse control, and fear of leaving her house. Paid employment was unrealistic at the time. (Tr. 493).

**B.    Medical Opinion Evidence**

Jennifer Bruning Brown, Ph.D., completed a mental RFC assessment on July 30, 2009. (Tr. 426). She stated that Wolfe had no limitations in the ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to

work in coordination with or proximity to others without being distracted by them, and to make simple work-related decisions. (Tr. 426). She had moderate limitations in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 426-27).

Wolfe had no limitations in social interaction except moderate limitations in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 427). She had no limitations in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (Tr. 427). In a psychiatric review technique, Brown stated that Wolfe had a major depressive disorder, recurrent, moderate. (Tr. 434). Wolfe also had alcohol dependence in early remission. (Tr. 439). She had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 441). There was insufficient evidence of episodes of decompensation. (Tr. 441). Brown found that Wolfe was partially credible. (Tr. 443). She had a long history of alcohol dependence, but did not appear to be using it at the time. She had a serious condition, but no marked limitations at the time. She appeared capable of work activity as outlined in the mental RFC. (Tr. 443).

Jerry Reed, M.D., completed a physical RFC assessment on July 30, 2009. (Tr. 446). He stated that Reed could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Tr. 447). She could stand, walk, and sit for about six hours in an eight-hour workday. She was unlimited in her ability to push and/or pull. (Tr. 447). Wolfe could occasionally climb a ramp or stairs and crawl and could frequently balance, stoop, kneel, and crouch. (Tr. 448). She had no manipulative, visual, communicative, or environmental limitations. (Tr. 449-50).

Dr. Reed stated that Wolfe's allegations were only partially credible. The evidence did not support the severity of limitations she alleged. She had received little medical treatment. She had good range of motion in her knees and only mild crepitus. With glasses, her eyesight was not significantly decreased. She appeared capable of work activity as outlined in the RFC. (Tr. 453). Dr. Reed's RFC was affirmed by Glen Knosp, M.D., on September 8, 2009. (Tr. 455).

Christopher Milne, Ph.D., completed a psychiatric review technique on September 22, 2009. (Tr. 459). He noted that upon reconsideration, Wolfe was alleging that her depression and concentration were worse. However, there was no medical evidence or updated report of activities of daily living to support any worsening of her condition. His review of the previous consultative examination showed only moderate impairment. He affirmed Brown's psychiatric review technique and mental RFC. (Tr. 459).

On August 23, 2011, Beverly Doyle, Ph.D., completed a psychoeducational evaluation. (Tr. 585). Doyle's testing showed that Wolfe's full-scale IQ was 71. (Tr. 587). She was determined to be functionally literate, except in math, and would need

12

assistance in handling funds. (Tr. 587). Wolfe was determined to be suffering from major depressive disorder, moderate, posttraumatic stress disorder, and alcohol dependence, early partial remission. Her GAF was 50. (Tr. 588).

On September 2, 2011, Burger stated that Wolfe had moderate limitations in the ability to deal with work stress. (Tr. 601). He stated there was concern because Wolfe had at least one incident in which she had an altercation with another worker. (Tr. 601). He stated that she had extreme limitation in the ability to complete a normal workday and workweeks without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He stated that she had problems with concentration. She also had sleep disturbances which would limit the energy necessary for a full day or week of work. (Tr. 601). Wolfe had moderate limitation in accepting criticism, but would be able to accept instructions. (Tr. 602). She had moderate limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. She also had moderate limitation in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She evidenced irritability that went beyond normal behaviors related to frustration. (Tr. 602). Wolfe had moderate limitation in the ability to interact appropriately with the general public. (Tr. 603). The severity of her symptoms would likely cause frequent and/or unpredictable absences from work of three or more days a month. (Tr. 603). Burger stated that Wolfe would likely be disabled even if she were to discontinue alcohol abuse. (Tr. 604). Doyle agreed with Burger's mental RFC. (Tr. 622). On September 2, 2011, Mary Murphy,

APRN, completed a medical questionnaire, in which she indicated that Wolfe was limited to sedentary work. (Tr. 619).

On September 7, 2011, Rodney Nitcher, M.D., completed a mental RFC. (Tr. 625). He indicated that Wolfe had disturbance of mood as evidenced by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, decreased energy, and difficulty concentrating or thinking. (Tr. 625). He saw no evidence of anxiety-related disorders. (Tr. 626). Dr. Nitcher stated that Wolfe had marked limitation in the ability to deal with work stress in that she was easily overwhelmed. She had marked limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. She had a low concentration level, was easily fatigued, and had low motivation. (Tr. 628). Wolfe had moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors or coworkers, as evidenced by her being easily irritated and in the ability to get along with coworkers or peers without distracting them. She had marked limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 629). She had moderate limitation in the ability to interact appropriately with the general public. (Tr. 630). Wolfe would likely have frequent and/or unpredictable absences from work. (Tr. 630). Dr. Nitcher stated that Wolfe was likely to be disabled even if she were to discontinue the alcohol abuse. (Tr. 631).

## C.   Other Evidence

Wolfe stated that she completed household chores, including making the bed, vacuuming, washing dishes, mopping, sweeping, and cooking. She stated she cannot

14

stand too long because her legs swell and she tires easily. (Tr. 246). Wolfe stated that she had friends do her laundry because she could not get up and down the stairs. (Tr. 246). Wolfe said she had no hobbies or time for activities because it took her all day to complete her household chores. (Tr. 247). She had appointments with doctors for depression once or twice a month. (Tr. 247). She watched television for three to four hours daily. Wolfe said she could walk four blocks to the store in 30 minutes because she had to stop and rest to catch her breath. (Tr. 247). Wolfe said she could stand for five or 10 minutes and then needed to take a break. She could sit for five or 10 minutes and then her leg started hurting and she needed to lie down to stretch it. (Tr. 247). Wolfe stated she had pain, fatigue, weakness, dizziness, shortness of breath, was depressed, and cried easily.. (Tr. 248). She said she was frustrated because of her limitations. (Tr. 248).

In interrogatories, Wolfe stated that she could not work because she could not see or stand very long, she had mood swings, she could not walk very far, and she had shortness of breath and chest pain. (Tr. 277). Wolfe said she took medication to help relieve her pain, but she had not taken any other actions to address her symptoms. (Tr. 280). She stated that her doctor had recommended alcohol cessation. (Tr. 280).

## D.    Hearing Evidence

At a hearing on September 8, 2011, it was noted that the onset date was the date of the filing of the application, May 13, 2009. (Tr. 51). Since that date, Wolfe had worked for a couple of weeks at a manufacturing plant about 2½ years earlier. (Tr. 52). In the previous 15 years, she had also worked as a housekeeping cleaner and as a production helper. (Tr. 52).

Wolfe testified that she had been depressed most of her life. (Tr. 53). She also had tendinitis in her arms, arthritis in her legs, and shortness of breath. (Tr. 53). Wolfe stated that she had been in remedial classes when in school. (Tr. 56). She stated that she had been attending classes about four times a week at Community Alliance for about one year. (Tr. 57-58). Wolfe stated that her symptoms include difficulty sleeping, overeating, going out too much, low self-esteem, forgetfulness, and crying. (Tr. 59). Wolfe had no full-time jobs since 1995. (Tr. 62). She did not believe she would be able to babysit for five days a week because she gets impatient and gets upset. (Tr. 63). She said she had slowed her drinking since going to Community Alliance about six months earlier. (Tr. 64). Wolfe said the last time she had gotten drunk was in June. (Tr. 66). Wolfe was trying to drink less and drank about once every two or three months. (Tr. 68-69).

Burger testified that he had a counseling relationship with Wolfe which began in January 2009. (Tr. 71). He had sessions with her about once or twice per month. The last time he had seen her was May 16, 2011. (Tr. 71). Burger stated that Wolfe continued to experience depression whether she was drinking or not. (Tr. 75). Burger stated that he did not believe Wolfe had the ability to sustain a 40-hour unskilled work schedule at a consistent pace because of the symptoms related to depression, particularly the sleeping problems. It would be difficult for her to complete a full day and be on time for work if she was not getting regular, full-time sleep. (Tr. 76). He stated that Wolfe was not compliant with taking medications during those periods when she was drinking. (Tr. 76-77). Burger had the perception that the periods between active alcohol

use had increased. (Tr. 78). When Wolfe took her medication, her depressive symptoms improved. (Tr. 78).

The ALJ asked Gail Leonhardt, the vocational expert (VE), a hypothetical question, assuming an individual of Wolfe's age, education, and past work history, with the limitations identified in the RFC. (Tr. 81). If the individual could do only unskilled work, with moderate limitations in attention and concentration, the person could be employed. (Tr. 81-82). The individual could work as a hand packager, and in the four-state region there were 14,148 jobs, and in the United States, there were 311,534 jobs. She could also function as a housekeeping cleaner, of which there were 16,638 jobs in the region and 366,755 in the United States. (Tr. 82). Adding a limitation that the individual would fail to show up for work for two or three days at a time every two months, the VE said the individual would be unlikely to be able to sustain employment. (Tr. 82). If the individual had marked limitations in the ability to complete a normal workday and workweek without interruptions and perform at a consistent pace, the individual would be precluded from all work. (Tr. 83). The VE stated that if the person had an IQ of 70 and a slow processing speed, she probably could not do production-type work. If the pace was slow, it would also affect the housekeeping job negatively. (Tr. 83).

### III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)). *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011).

"Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003). *See also Collins*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

### A.   Listing 12.05C

Wolfe first argues that she meets Listing 12.05C and that the ALJ erred in failing to address the listing. The ALJ did not specifically analyze this listing when he determined whether Wolfe's mental impairments met any listing. Listing 12.05 states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

Wolfe asserts that she meets the requirements of the listing because Doyle determined that Wolfe's full-scale IQ was 71 and her verbal comprehension IQ was 70. (Tr. 587). She claims that her deficits in adaptive functioning before the age of 22 are obvious from the evidence of remedial courses in school and by her sparse employment history. (Pl.'s Br. at 11). And she argues that there is no question that she has a physical or other mental impairment that imposes an additional and significant work-related limitation of function. (*Id.*)

It is Wolfe's burden to demonstrate that she has an impairment that is presumed to be disabling. She must show through medical evidence that her impairment met all of the specified medical criteria contained in a particular listing. *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010), *citing Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

The U.S. Circuit Court of Appeals for the Eighth Circuit has interpreted Listing 12.05C to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Phillips v. Colvin*, 721 F.3d 623, 625 (8th Cir. 2013), *citing McNamara v. Astrue*, 590 F.3d 607, 610-11 (8th Cir. 2010).

In the case at bar, there is no evidence of Wolfe's IQ prior to the age of 22. She stated that she was in remedial classes, but she was not enrolled in special education and she never was required to repeat a grade in school. (Tr. 412, 585). Wolfe dropped out of school in the 11th grade and later obtained her GED. (Tr. 412, 585-86). Thus, there is no evidence of an impairment prior to the age of 22.

Although the ALJ found that Wolfe had several severe impairments, he did not find that any impairment affected her ability to work. She is able to care for her personal needs on a daily basis, except for needing assistance with carrying laundry down stairs. She indicated that she was able to complete basic household chores, but it might take her some time to complete them. (Tr. 27, 246-50). The record showed that Wolfe's depression, which was exacerbated by alcohol use, affected her motivation to take care of personal needs, but there was no evidence that Wolfe was incapable of living independently. (Tr. 262, 416). Grubler opined that Wolfe had the ability to carry out at least short and simple instructions. (Tr. 416). Even though Doyle determined that Wolfe's IQ was 71, she was considered functionally literate, except in math. (Tr. 587).

The ALJ thoroughly reviewed the medical evidence and heard testimony at the hearing. He followed the five-step sequential evaluation process. Although he did not specifically refer to Listing 12.05C, "[a]s a general rule, we have held that an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) (ALJ did not cite or reference any specific listing). Wolfe did not carry the burden to demonstrate that she satisfied the requirements of Listing 12.05C, and the ALJ did not err in failing to analyze its application.

## B.  New Evidence Submitted at Appeals Council Level

After the decision of the ALJ was entered, Wolfe submitted new evidence to the Appeals Council. Wolfe asserts that the evidence was not added to the official record, and she has submitted it as appendices to her brief. It includes reports from her treating psychologist, Burger, dated March 19, 2013, and March 21, 2013, (Appendix 1 to Pl.'s Br.), a workshop evaluation from WESCO Industries, a rehabilitation facility, dated March 20, 2013, (Appendix 2 to Pl.'s Br.) and records from Community Alliance, dated January 5, 2012, through February 28, 2013.

The Appeals Council noted that it had considered records from Community Alliance dated August 2, 2011, to December 16, 2011, and determined that it did not provide a basis for changing the ALJ's decision. (Tr. 4-5). The Appeals Council also stated that it reviewed the information from Burger, Community Alliance, and WESCO, all dated in 2012 or 2013. The ALJ decided the case through October 17, 2011, and the new information was related to a later time. The Appeals Council stated that the

21

information therefore did not affect the decision about whether Wolfe was disabled beginning on or before October 17, 2011. It informed Wolfe that if she wanted the Appeals Council to consider whether she was disabled after that date, she needed to apply again. (Tr. 5).

The Appeals Council properly refused to consider the new evidence after finding it was not related to the period at issue. Pursuant to Social Security regulations, "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b).

The review by this court under 42 U.S.C. § 405(g) is limited to the evidence that was before the Commissioner at the time of the decision. *See Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997). "Remand is appropriate only upon a showing by the claimant 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Id.*, *citing 42* U.S.C. § 405(g). "To be considered material, the new evidence must be 'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" *Id.* In addition, "[i]t must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits." *Id.*

The court also stated that it is implicit that the "new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition." *Id.* "Additional evidence showing a deterioration in a claimant's condition significantly after the date of

the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits." *Id.*

In the present case, the additional evidence was either considered by the Appeals Council or was related to Wolfe's functioning and capabilities in 2013, which was after the ALJ's decision was entered. There is no support for a finding that the new evidence would have resulted in an award of benefits.

## C.   RFC Assessment Unsupported by Substantial Evidence

Finally, Wolfe argues that the ALJ's RFC assessment was not supported by substantial evidence based on the record as a whole. (Pl.'s Br. at 11). The ALJ determined that Wolfe had the RFC to perform unskilled work of a specific vocational preparation (SVP) of 1 to 2.[4] (Tr. 35). The ALJ determined that Wolfe could lift up to 20 pounds occasionally and 10 pounds frequently and that she could sit or stand for six hours in an eight-hour workday. (Tr. 35). Wolfe had moderate limitations in the ability to maintain attention and concentration for extended periods, to work within a schedule, to maintain regular attendance, to be punctual, to accept instructions and respond appropriately to criticism from supervisors, to complete a normal workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest breaks. The ALJ defined moderate limitation as presenting a problem but still retaining the ability to perform each function satisfactorily. (Tr. 36).

---

[4] "The [Specific Vocational Preparation] level listed for each occupation in the [Dictionary of Occupational Titles] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation." *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010).

As noted previously, the RFC is what the claimant is able to do despite limitations caused by all of her impairments. *Lowe v. Apfel*, *supra*. "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Id.*

The ALJ found that Wolfe's other alleged medical issues, including enlarged heart, hypertension, back pain, headaches, neck and shoulder pain, vision deficits, shortness of breath, and fatigue, were not been tied to medical impairments. (Tr. 25). The medical evidence showed one visit to the emergency room in May 2010 for back pain, but there was no objective evidence of musculoskeletal abnormality in her spine. (Tr. 25). The record also did not include any evidence that Wolfe required any maintenance medications for headaches or that they would limit her ability to work. (Tr. 25). Wolfe's complaint of shortness of breath was related to her condition of obesity, and there was no evidence of lung or pulmonary disease or recent cardiovascular abnormality. (Tr. 25). Her chest pain was ultimately determined to be musculoskeletal. (Tr. 26). The ALJ noted that the only objective evidence regarding musculoskeletal abnormality was x-rays of her right knee in March 2009 which showed mild degenerative changes. (Tr. 26).

The record showed that Wolfe had established a basic pattern of short periods of one to two months of sobriety with intervening periods of extended alcohol abuse. (Tr. 27). The ALJ determined that Wolfe did not meet the "paragraph B" criteria because her

24

mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation. (Tr. 27).

The ALJ stated that the record did not contain findings or other evidence of physical impairment that would reduce Wolfe to work at less than the light level. Aside from obesity and some abnormality with her right knee, Wolfe's treatment history for physical health was unremarkable. She had complained infrequently of pain and had not been prescribed more than conservative treatment modalities such as physical therapy and routine medications at routine dosages. (Tr. 29).

Only one treating source opinion, from Mary Murphy, APRN, in September 2011, indicated that Wolfe was limited to sedentary work. (Tr. 30). The ALJ gave the opinion little weight because there was no firm basis for the conclusion and Murphy saw Wolfe only on seven occasions between November 2010 and May 2011. None of the visits illustrated Murphy's first-hand knowledge of Wolfe's condition that would lead to sedentary work restrictions. In addition, she was a non-acceptable medical source. The severity of her assessment was not supported by the medical evidence. (Tr. 30).

The greatest weight was given to the assessments of the state agency's medical consultants who found that Wolfe would be restricted to light exertional work with some consideration for postural limitations. (Tr. 30). Their opinions were consistent with the available physical evidence and they had reviewed all the evidence. (Tr. 32).

As to the alleged mental impairments, the ALJ gave great weight to Grubler's opinion that Wolfe would be capable of maintaining sufficient attention and concentration to complete at least short and simple tasks, remember short and simple instructions, relate appropriately to coworkers and supervisors, and adapt to changes in

25

her environment. (Tr. 31). Grubler's conclusions were based on a thorough evaluation in a time of sobriety and were not refuted by other evidence, excepting the opinions of treating physicians, whose opinions were called into question. (Tr. 31).

The ALJ also found that Wolfe's IQ results, which showed that she was at the borderline level of intellectual functioning and processing speed and working memory, would direct that Wolfe be limited to no greater than unskilled work regardless of her alcohol use. (Tr. 31).

The ALJ found that Dr. Nitcher's findings and opinion that Wolfe had a vastly decreased RFC were not supported by his own treatment notes. (Tr. 32). In fact, most recently, in May 2011, Dr. Nitcher remarked that Wolfe was doing well with no overt psychosis, fair insight and judgment, and a euthymic to mildly depressed mood. (Tr. 32).

The ALJ stated that he could not accept Burger's opinion in full because it pertained to sobriety. Although Burger had followed Wolfe rather regularly since January 2009, the ALJ found his treatment notes were essentially unintelligible. Doyle's endorsement of Burger's assessment was given little weight because her one-time evaluation did not address many aspects of Wolfe's illness and Doyle had no perspective as to Wolfe's longitudinal condition. The ALJ stated that Burger was unable to convincingly explain that Wolfe would be as severely limited in mental capacity if she was abstinent. (Tr. 32).

The ALJ found that, if Wolfe stopped the substance use, she would have mild restriction in activities of daily living. Multiple medical sources indicated that Wolfe was independent in her activities of daily living. (Tr. 34). If the substance use were stopped, Wolfe would have moderate difficulties in social functioning and in concentration,

persistence, or pace. However, it would be expected that Wolfe would have limitations in this area given her borderline intellectual functioning and deficits in processing speed and memory. (Tr. 34).

The ALJ found that, if Wolfe stopped the substance use, her medically determinable impairments could reasonably be expected to produce the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 36-37). The ALJ found that Wolfe's complaints of discomfort, mental limitations, and a pain level that precluded all types of work were inconsistent with the objective medical evidence, the absence of more aggressive treatment, and the evidence as a whole. Thus, her allegations were not fully credible. (Tr. 37).

The ALJ found there was no evidence to support a finding that Wolfe's physical impairments would limit her as alleged. (Tr. 37). As for her mental functioning, Wolfe was clearly less limited when not using alcohol. The ALJ relied on the assessment of Grubler, in combination with the notes from treating providers during periods of abstinence, which illustrated that Wolfe was significantly less affected by her symptoms as a whole. Grubler's findings and assessment were not disputed by the later evidence in times of sobriety when Wolfe was shown to have a better mood and higher functionality—often by the same physicians who endorsed her to have more severely debilitating symptoms. (Tr. 37).

The ALJ stated that Wolfe had alleged completely disabling symptoms and limitations, but her allegations were not supported by substantial evidence, were contradicted by multiple factors, and were not substantiated by medical evidence. (Tr.

38). The ALJ stated that Wolfe's own statements regarding her drinking habits since the application date were called into question. She represented herself as having been sober or drinking less in direct contrast with records from Community Alliance. (Tr. 38). The ALJ found that Wolfe's statement that she had not held a job in years because of her alcoholism raised a question as to whether her continuing unemployment was actually due to medical impairments outside of her struggles with alcohol abuse. (Tr. 38). The court agrees with the ALJ's findings.

The record shows that the ALJ thoroughly reviewed the medical evidence, testimony from the hearing, and other documents to determine that Wolfe could perform other work that existed in significant numbers in the national economy. The VE stated that a person of the same age, education, and work experience as Wolfe and with the same limitations could perform work in the unskilled light labor market. Representative examples of occupations included production assembler, hand packager, and housekeeping cleaner. (Tr. 82). When the hypothetical question asked of the VE is adequate, the VE's testimony is reliable to establish that there are jobs that the claimant can perform that exist in significant numbers within the regional and national economies. *See Gragg v. Astrue*, 615 F.3d 932, 941 (8th Cir. 2010). The ALJ did not err in determining Wolfe's RFC and finding that she is not disabled.

## V.   CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

28

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate document.

Dated this 11th day of July, 2014

                              BY THE COURT:


                              S/Laurie Smith Camp
                              Chief United States District Judge